UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

YASIN AHMED FARAH,

    Plaintiff,

v.

HEATHER WEYKER, *in her individual capacity as a St. Paul Police Officer*; JOHN DOES 1-5, *in their individual capacities as St. Paul Police Officers*; THE CITY OF ST. PAUL; *and* RICHARD ROES 1-5, *in their individual capacities as federal law enforcement officers*,

    Defendants.

Case No. 16cv1289 (JNE/TNL)
ORDER

## I.    INTRODUCTION

Plaintiff Yasin Ahmed Farah alleges violations of his constitutional rights in an investigation that led to his indictment by a federal grand jury and his subsequent arrest. He sues Defendants Heather Weyker, a police officer for the St. Paul Police Department in Minnesota; John Does 1-5, who are allegedly St. Paul police officers who either supervised or worked with Weyker on the investigation; Richard Roes 1-5, who are allegedly federal law enforcement officers who supervised or worked with Weyker on a child sex-trafficking "task force" to which she was assigned; and the City of St. Paul ("St. Paul"). Weyker moves to dismiss Farah's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and on absolute and qualified immunity grounds. Dkt. No. 28. St. Paul moves on behalf of the City of St. Paul and John Does 1-5 for judgment on the pleadings pursuant to Rule 12(c). Dkt. No. 34.

The investigation at the core of Farah's civil complaint primarily targeted a suspected venture involving the sex-trafficking of minor girls across Minnesota, Tennessee, and Ohio. The

investigation resulted in the criminal indictment of thirty people, mostly Somali, in the Middle District of Tennessee in 2010-2011 ("Tennessee Case"). Farah alleges that Weyker fabricated evidence about him and others throughout the investigation, resulting in a tainted indictment that was corrupted by Weyker's continuing deception, and causing his unlawful arrest and detention.

Nineteen of Farah's co-defendants in the Tennessee Case bring separate suits similarly alleging constitutional violations, and a twenty-first person brings another related civil suit. The parties agreed to coordinated briefing on the Defendants' motions. The Court assumes familiarity with its fuller opinion in one of the related cases, *Osman v. Weyker, et al.*, No. 16cv908 ("Osman Opinion") (filed simultaneously herewith), and will not repeat that opinion's discussion verbatim here. Farah opposed the motions. *See* Opp. to Weyker Mot. to Dismiss ("Fed. Opp."), Dkt. No. 39; Opp. to St. Paul Mot. ("City Opp."), Dkt. No. 42.

The Court held a hearing on Defendants' motions on May 3, 2017, and now grants in part and denies in part Weyker's motion and grants St. Paul's motion.

## II. APPLICABLE STANDARDS

A motion to dismiss or a motion for judgment on the pleadings is appropriately granted "only when there is no dispute as to any material facts and the moving party is entitled to judgment as a [m]atter of law." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted). To survive a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Haney v. Portfolio Recovery Assocs., LLC*, 837 F.3d 918, 924 (8th Cir. 2016), *as amended* (Dec. 27, 2016). *See also* Osman Op. 3-4.

## III. ALLEGATIONS

Many of the allegations are similar to those alleged by Osman and summarized and analyzed in the Court's order in that case. *See, e.g.*, Osman Op. 4-8. The Court briefly recounts some allegations in Farah's Amended Complaint and some facts gleaned from the Tennessee Case record.[1]

In the summer and fall of 2009, Farah, "who was then 18 years old, living at home with his parents and had no juvenile or criminal record, visited MySpace.com on the Internet, including the MySpace page of" Jane Doe Two. Compl. ¶ 9. Farah "found Jane Doe 2 attractive and became interested in meeting her in the hope of forming a social relationship with her." Compl. ¶ 10. "To that end," during this time frame, Farah emailed Jane Doe Two more than once through MySpace "suggesting that they get together and 'hang out.'" *Id.* Apparently not having success in catching her attention, "[t]o try to elicit Jane Doe 2's interest in him, Farah told her in one of the e-mail messages he sent to Jane Doe 2 on November 4, 2009 that he had a 'good mission' for her . . . ." Compl. ¶ 11. In a message he sent on November 9, 2009, Farah wrote that he "did not wish to describe" the "mission" on MySpace "and that she would find out about the 'mission' when she met him." *Id.* Jane Doe Two never accepted Farah's proposal to get together, and the two never met in person. Compl. ¶ 13.

"When Farah sent his November 4 and 9, 2009 e-mails to Jane Doe 2, it was a common idiom among young Somalis to describe the purpose or agenda of any informal social gathering or meeting as the 'mission' for that occasion." Compl. ¶ 12.

In November 2009, Weyker visited Farah and interviewed him. *See* Compl. ¶¶ 14-15. She "asked if he was friends or acquainted with a number of other young Somali men from

---

[1] The Court may take judicial notice of public documents in the Tennessee Case record. *Greenman*, 787 F.3d at 887.

3

Minneapolis (who later became other defendants in the [Tennessee Case])," and he acknowledged that he was acquainted with a number of the identified individuals through school or the tight-knit Somali community in Minneapolis. Compl. ¶ 14. He truthfully informed her that he did not consider any of these individuals to be close friends and that he had spent "almost no time socializing with any of them." *Id.* Weyker also asked Farah what he had meant in his earlier emails to Jane Doe Two by the term "mission." Compl. ¶ 15. "Farah truthfully told Weyker that it merely meant that he wanted to get together with Jane Doe 2 and 'hang out.'" *Id.*

In January 2010, Farah was subpoenaed to testify before a grand jury in Nashville, Tennessee, and he complied. Compl. ¶ 16. He testified truthfully, providing substantially the same answers to questions that were substantially the same as Weyker's questions to him in November 2009. *Id.*

Farah was arrested on November 8, 2010, pursuant to a First Superseding Indictment ("FSI") in the Tennessee Case. *See* Compl. ¶ 17; FSI, *United States v. Farah*, No. 3:10cr260, Dkt. No. 36 (M.D. Tenn. Nov. 3, 2010). That indictment charged him with obstruction of justice in three counts. *See* Compl. ¶ 1. Count 5 alleged that in his January 27, 2010, testimony before the grand jury, Farah:

> knowingly did make a false material declaration, that is to say: "To see her, you know." and "It is like, 'let's hang out.' If you ask me, to me, that is equivalent of 'let's hang out[.]'["]

FSI ¶ 83. It alleged that the grand jury was investigating whether a sex-trafficking conspiracy in violation of 18 U.S.C. § 1591 had occurred, and that "[i]t was material to said investigation that the grand jury ascertain the meaning of the word 'mission' as used by [Farah]." FSI ¶ 84. Count 5 concludes that Farah's testimony was false in that he "knew that the word 'mission' as used with the recipient of his message did not mean 'let's hang out'." FSI ¶ 86. Count 6 also alleges obstruction of justice by Farah based on his January 27, 2010, testimony before the grand jury,

4

and Count 7 similarly alleges obstruction of the enforcement of 18 U.S.C. § 1591 based on the same conduct. The indictment also alleged that Farah was an "associate" of certain Minneapolis-based Somali gangs, but did not allege that he was a gang member, nor did it charge him with participation in any of the sex-trafficking crimes charged in the indictment and allegedly perpetuated by members and associates of those gangs. *See* Compl. ¶ 17; FSI ¶ 1(f) (naming him as an "associate of members" of two gangs).

The indictment's sex-trafficking-conspiracy charges included some allegations about the alleged co-conspirators' use of the word "mission" as code for prostitution. Compl. ¶ 25. These allegations, which were included in Count 1 of the First Superseding Indictment and incorporated by reference into Count 2, were:

- "Jane Doe Two was informed" by certain named defendants—not Farah—that "selling Jane Doe Two for sex would be called a 'Mission,'" FSI ¶ 13;

- "The term 'Mission', when referring to Jane Doe Two, at all times relevant to this Indictment, meant having Jane Doe Two engage in a sex act for money or other things of value," FSI ¶ 14; and

- "After engaging in [a] sex act with Jane Doe Two, [a co-defendant] informed Jane Doe Two that they were then going to perform a 'Mission'. [That co-defendant] then approached males and attempted to have the males exchange money for sex with Jane Doe Two," FSI ¶ 19.

Weyker "had good reason to doubt" that Jane Doe Two was a minor at the time of the alleged sex-trafficking of her as "a minor." Compl. ¶ 27. For example, Weyker "went so far as to provide to other investigators on the 'task force' and prosecutors as evidence of the claim that Jane Doe 2 was a minor a forged birth certificate . . . which Weyker knew to be false and to have materially understated Jane Doe's age by as much as several years." *Id.* In addition, Weyker "knew that during the times alleged in the indictment," Jane Doe Two "willingly and voluntarily chose to associate and socialize frequently with some of the other defendants" in the Tennessee Case, and that she "engage[d] in completely lawful activities with them, often including

5

consensual, uncompensated and lawful sexual activity." Compl. ¶ 28. Weyker also knew "that when those other defendants asked Jane Doe 2 and other alleged victims . . . to meet them to associate and socialize and engage in *completely lawful activities* with them, they would often use the word 'mission' to describe the object or purpose of gathering." *Id.* (emphasis added).

Weyker "coerced, intimidated, pressured, threatened and bribed the alleged victims of the fictitious child sex trafficking conspiracy, including Jane Doe 2, into falsely recounting and testifying that they had been paid for sex in encounters arranged by other defendants," and that "other defendants in the [Tennessee Case] arranged such encounters with the alleged victims by referring to them as 'missions' . . . ." Compl. ¶ 29. For example, Farah alleges that, as a Sixth Circuit judge noted in a later appellate decision regarding the Tennessee Case, Jane Doe Two gave inconsistent accounts of what happened on a trip she took with certain co-defendants (not Farah) to Nashville, at first "not mention[ing] any prostitution or sex trafficking," but then, "when the Nashville Police put her on the telephone with Officer Weyker, [] chang[ing] her story to include acts of prostitution and sex trafficking." Compl. ¶ 41(e) (quoting *United States v. Fahra*, 643 Fed. Appx. 480, 483 (6th Cir. 2016)).

After his arrest, Farah appeared at a detention hearing before a magistrate judge in the District of Minnesota, at which the government offered no evidence in support of detaining him, and the judge ordered him released on conditions. Compl. ¶ 19. The government appealed the order to the district judge in the Tennessee Case, and in March 2011, the district court issued an order for Farah's release on conditions. Compl. ¶¶ 20, 23. Farah was released but remained subject to pretrial restrictions until March 2016. Compl. ¶¶ 24, 44.

In Spring 2012, nine of Farah's co-defendants went to trial. Compl. ¶ 39. Farah had opted to be tried later with a different group of defendants. *See United States v. Adan*, 913 F.

6

Supp. 2d 555, 559 (M.D. Tenn. 2012). In the Spring 2012 trial, six defendants were fully acquitted by the jury, and the jury convicted the other three defendants on some charges. *See* Compl. ¶ 39. The district court then granted the three convicted defendants' Federal Rule of Criminal Procedure 29 motions for judgments of acquittal, on the basis of a variance. *See* Compl. ¶ 39; *Adan*, 913 F. Supp. 2d at 579.

The government appealed the district court's grant of the Rule 29 motions after the Spring 2012 trial, and in March 2016, the appellate court affirmed the district court. Compl. ¶¶ 40, 41 (citing *Fahra*, 643 Fed. Appx. 480 (6th Cir. 2012)). After the appellate decision issued, the government moved to dismiss all remaining charges against all remaining defendants, and the court granted the motion on March 10, 2016. *See* Compl. ¶ 44. Farah was then released from pretrial restrictions. Compl. ¶ 44.

Like Osman, Farah alleges that the charges of a wide-ranging sex-trafficking conspiracy were baseless and that Weyker fabricated or exaggerated the "evidence" that the indictments were "primarily based upon." Compl. ¶ 35; *see also* Compl. ¶¶ 38, 46. He likewise alleges that Weyker manipulated and coerced Jane Doe witnesses, including Jane Doe Two, into falsely recounting and testifying. Compl. ¶ 29. He likewise alleges that indications of Weyker's fabrication included questions surrounding the Jane Does' ages, especially Jane Doe Two's, Compl. ¶¶ 27, 41(c); Weyker's rough notes, Compl. ¶¶ 32-33, 41(a); questions surrounding Jane Doe Two's April 2009 trip to Nashville, Compl. ¶¶ 30, 41(c), 41(e); and the results of the April 2012 trial, Compl. ¶¶ 39, 41(f). Also like Osman, Farah's complaint cites pointedly to remarks about Weyker and the case by the appellate court in the Tennessee Case. *See* Compl. ¶ 41.

### IV. SUMMARY OF ARGUMENTS

The Court summarizes the parties' arguments to provide context. The arguments are

similar to those described in the Osman Opinion, *see* Osman Opp. 8-10, but because Farah is represented by different counsel than Osman, the opposition briefing was not identical.

Defendants contend there are myriad reasons to dismiss this action. *See* DOJ Br., Dkt. No. 30. Weyker argues that all claims brought against her pursuant to 42 U.S.C. § 1983 must be dismissed as a matter of law because she was acting as a federal agent at the time of Farah's indictment, arrest, and detention, and federal actors are not subject to § 1983 liability. She then contends that the federal analog to § 1983 under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), is not available to Farah or the other plaintiffs. Weyker further asserts that even if Farah might theoretically be able to bring a § 1983 or *Bivens* cause of action, his complaint still fails. First, to the extent the claims are based on Weyker's testimony in court, they are barred by absolute immunity. Second, the claims are otherwise barred by qualified immunity because the facts alleged do not make out a violation of a constitutional right that was clearly established at the time of the alleged violation. Third, Weyker's brief, which addressed all twenty-one plaintiffs' complaints, argues that plaintiffs have not plausibly pleaded personal liability for Weyker's supervisor John Bandemer, whom Farah's complaint does not name. Fourth, Weyker argues that the plaintiffs cannot bring claims for violations of due process for two reasons: They are barred by *Parratt v. Taylor*, 451 U.S. 527 (1981), in that the criminal defendants had adequate post-deprivation process. And the recent Supreme Court decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), and other binding precedent hold that Farah's allegations sound, if at all, in the Fourth Amendment. *See also* DOJ Reply, Dkt. No. 47. But he has not stated a claim for a Fourth Amendment violation because he has not plausibly alleged that there was not arguable probable cause to arrest him. Finally, Weyker asserts that some plaintiffs were indicted for not just allegedly fabricated sex-trafficking-

related crimes but also for separate crimes, and that qualified immunity bars a Fourth Amendment cause of action for all of these plaintiffs. Significantly, Weyker does not extend this argument to Farah, conceding that "his perjury charge was intertwined with the sex trafficking allegation." DOJ Reply 31 n.12. Separately, St. Paul argues that Farah fails to state a claim against the City of St. Paul or John Does 1-5 because he has not plausibly alleged supervisory or vicarious liability, nor municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See* St. Paul Br. & Reply, Dkt. Nos. 36 & 49.

In opposition to Weyker's motion, Farah argues that Weyker was acting in her capacity as a St. Paul police officer and thus he should bring his claims under 42 U.S.C. § 1983, but that if Weyker was acting as a federal agent, Farah should be able to bring a *Bivens* action. Farah posits that the entire action is not barred on the basis of absolute immunity and that Weyker is not insulated from liability for fabricating evidence or other misconduct that was not in preparation for testimony. He contends that fabricated-evidence claims have been recognized in substantive due process cases in the Eighth Circuit, citing, among many other cases, *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002) (*en banc*), and arguing that *Stewart v. Wagner*, 836 F.3d 978 (8th Cir. 2016), is distinguishable. Farah further argues that he states a claim for violation of his Fourth Amendment rights for arrest and pretrial detention without truthful probable cause.

In opposition to St. Paul's motion, Farah argues that he has stated a claim for failure to supervise and control Weyker, and for municipal liability under *Monell*, based on his allegations that Weyker's supervisors reviewed almost none of Weyker's reports throughout the investigation. Farah argues that the supervisors had notice of Weyker's fabrications based on the district court's "call[ing] out" of Weyker on several occasions in the Tennessee Case proceedings. City Opp. 8.

## V. LEGAL ANALYSIS

As explained fully in the Osman Opinion, pursuant to *Manuel v. City of Joliet*, 137 S. Ct. 911 (Mar. 21, 2017), Farah's claims must be analyzed under the Fourth Amendment, not the Fifth or Fourteenth. *See* Osman Op. 11-13; *see also id.* at 17-22. His complaint is that he "would never have been indicted, arrested, held in jail for months, and subjected to onerous conditions of release for more than five years had it not been for Weyker's knowing, deliberate, illegal and unconstitutional fabrication and exaggeration of evidence against him and the other defendants" in the Tennessee Case. Compl. ¶ 46; *see also* Fed. Opp. 26 ("Farah was seized, arrested and detained without probable cause . . . ."). In other words, he complains "that a form of legal process resulted in pretrial detention unsupported by probable cause." *Manuel*, 137 S. Ct. at 919. So "the right allegedly infringed lies in the Fourth Amendment." *Id.* A "constitutional division of labor" applies to claims similar to Farah's. *Id.* at 920 n.8. Because he challenges his pretrial detention, his claim is under the Fourth Amendment. In contrast, if he had been convicted and were to challenge the sufficiency of the evidence supporting that conviction, his claim would then be analyzed under the Due Process Clause of the Fourteenth Amendment because "once a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support *both a conviction and any ensuing incarceration* does so under the Due Process Clause . . . ." *Id.* (emphasis added) (citations omitted). Farah's claims for substantive due process violations under the Fifth or Fourteenth Amendments therefore fail. *See Manuel*, 137 S. Ct. at 919-20; *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Under the Fourth Amendment analysis, the Court must decide whether Farah plausibly alleges that the Defendants violated his right to be free from unreasonable seizure by arresting and detaining him without arguable probable cause, based on fabricated evidence.[2]

To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, the court applies the analysis set out in *Franks v. Delaware*, 438 U.S. 154 (1978).  *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101, 105 (1st Cir. 2013).  Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause.  *See Franks*, 438 U.S. at 156; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014).  The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading.  *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959.  If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment.  *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 958-59; *Hernandez-Cuevas*, 723 F.3d at 105.  Probable cause "exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."  *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015) (citation omitted).

---

[2] Because the Court finds that only the Fourth Amendment, and not substantive due process, is applicable; because a Fourth Amendment claim in this case does not present a new context for a *Bivens* action; and because § 1983 and *Bivens* claims are analyzed similarly, the Court does not reach the question of whether Farah's claim should be brought under § 1983 or *Bivens*.  *See* Osman Op. 13-17.

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, courts ask whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)) (applying this standard to a Fourth Amendment claim for detention based on allegedly false and incomplete information in a probable cause statement). "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899. "It is clearly established that the Fourth Amendment requires a *truthful factual showing* sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (emphasis added) (citation omitted).

### a. Analysis of Farah's Claim Under the Fourth Amendment

In considering whether Farah plausibly alleges a Fourth Amendment violation, the Court disregards mere conclusory statements, focuses on well-pleaded factual allegations, and applies its judicial experience and common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court also properly considers the Tennessee Case court record in assessing the pleadings. *See, e.g.*, *Greenman*, 787 F.3d at 887.

Many of Farah's allegations are similar to Osman's, including his extensive quoting of the Sixth Circuit's *Fahra* decision, which in turn mentions several comments by the district court, such as in the December 2012 order granting the three defendants' Rule 29 motions. For instance, he quotes the *Fahra* opinion's noteworthy description of "the story the prosecution presented at trial" as "likely a fictitious story." Compl. ¶ 41(f) (quoting *Fahra*, 643 Fed. Appx. at 484). In the Osman Opinion, the Court examines several orders and memoranda by the district

court and two separate Sixth Circuit Court of Appeals opinions concerning the Tennessee Case. *See* Osman Op. 25-33.

In Osman's case, the Court found that some of the quoted and referenced statements by judicial officers are remarkable, and that taken all together along with other well-pleaded facts, they nudge Osman's Fourth Amendment claim as to Weyker over the *Iqbal* plausibility line. Farah was not charged in sex-trafficking-conspiracy counts, but as Weyker concedes, *see* DOJ Reply 31 n.12, the charges against him are intertwined with the sex-trafficking charges. Farah's detailed references to the appellate court's opinion in *Fahra* and some of the topics raised in it— particularly comments about Weyker and Jane Doe Two—lend some plausibility to his allegations because Jane Doe Two was the fulcrum of the indictment's charges about the meaning of the word "mission." In addition, like Osman, he alleges well-pleaded facts specific to his own case. Farah alleges that he has no more than a passing acquaintance with the other co-defendants; that he never met Jane Doe Two; and that when he used the word "mission" in his email, it meant to him something innocuous, unrelated to prostitution. Compl. ¶¶ 13-15. Moreover, he alleges that his definition of "mission" was consistent with the generally understood use of that word in the young Somali community. Compl. ¶ 12. He further alleges that Weyker knew that his grand jury testimony to that effect was not perjurious because his answers to her November 2009 interview questions were consistent with this January 2010 testimony. Compl. ¶ 16; *see* Compl. ¶ 36. The consistency of Farah's responses and protestations of being uninvolved with the co-defendants and any alleged sex-trafficking is relevant because the testimony that the indictment alleged was perjury was Farah's testimony about what "mission" meant *to him*. FSI ¶¶ 83, 85-86 ("Now, when you sent the message, I have got a good mission for you, what did you mean?" . . . "If you ask me, to me, that is equivalent of

13

'let's hang out'"). His allegation that he never really associated with the co-defendants strengthens the inference that he would not have known about their allegedly different definition of the term "mission." The Court must accept Farah's factual allegations as true and construe the pleaded facts in his favor at this procedural stage. *Greenman v. Jessen*, 787 F.3d 882, 885 & n.2 (8th Cir. 2015). Therefore, consistent with the analysis in the Osman Opinion, *see* Osman Op. 22-35, the Court finds that Farah's allegations of a Fourth Amendment violation by Weyker in fabricating evidence related to sex trafficking also survive Weyker's motion to dismiss. The same caveats that the Court noted in the Osman Opinion apply as well to Farah's allegations.

Weyker argues that Farah's own allegations show that there was arguable probable cause to indict, arrest, and detain him on perjury charges. DOJ Reply 23-24. She points out that when Farah emailed Jane Doe Two to say he had a "good mission" for her, and Jane Doe Two in response asked what was good about the mission, Farah said that he could not tell her on MySpace and that she had to keep the information "low low." *Id.* at 24 (citing *United States v. Farah*, No. 3:10cr260, Dkt. No. 504 (M.D. Tenn. Mar. 3, 2011), submitted in this civil case as DOJ Reply Ex. W, Dkt. No. 48-1). Weyker argues that an officer could reasonably conclude that Farah lied when he testified that "mission" meant "hang out," "especially considering that Farah would not explain the mission online and that he told Jane Doe Two to keep quiet about it." DOJ Reply 24. However, in conducting the *Franks* analysis at this stage, taking Farah's allegations as true, the Court must set aside allegedly fabricated evidence not just concerning Farah but also supporting the allegedly fictitious sex-trafficking conspiracy, *see* Compl. ¶ 46—including whatever information formed the basis of the Count 1 allegations about the use of the word "mission" as a code word for sex-trafficking Jane Doe Two. Setting aside that evidence leaves little basis to find arguable probable cause to arrest Farah.

14

### b. Supervisory Liability

Farah also sues John Does 1-5 (St. Paul police officers) and Richard Roes 1-5 (federal law enforcement officers) in their individual capacities as Weyker's supervisors and colleagues. He alleges that they were deliberately indifferent to Weyker's violations of his rights. Compl. ¶¶ 64, 70. St. Paul argues for granting judgment on the pleadings on behalf of its unnamed officers.

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see also S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers*, 700 F.3d at 355). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* The notice prong requires that "[t]o impose supervisory liability, other misconduct [allegedly giving the supervisor notice] must be very similar to the conduct giving rise to liability." *Id.* (quoting *Livers*, 700 F.3d at 356).

Farah's complaint contains even fewer allegations regarding supervisory liability than Osman's, which the Court found were insufficient. *See* Osman Op. 37-41. He alleges conclusorily that the John Does and Richard Roes had supervisory responsibility over Weyker or were otherwise somehow responsible for stopping her. Compl. ¶¶ 1, 4-5, 64, 69. He states that they were on notice of her constitutional violations, *see, e.g.*, Compl. ¶¶ 4-5, but lacks well-pleaded facts to support that allegation. Farah alleges that "[b]y the end of 2012, Weyker's

15

colleagues and supervisors . . . were aware of Weyker's extensive and wide-ranging fabrication and exaggeration of the evidence used to charge Farah and the other defendants . . . because of the acquittals of the nine defendants tried in the March 2012 trial and Judge Haynes' exposure on the record of Weyker's misconduct." Compl. ¶ 42. He does not cite any particular instances of "exposure." Assuming that he is obliquely referring to the same orders that Osman cites in her complaint in support of her notice allegations, those allegations do not suffice, for the same reasons. Similarly, his rather vague allegation that Weyker's supervisors did not review the "overwhelming majority" of her police reports submitted while she worked on the "task force" does not lead to the conclusion that her supervisors turned a blind eye so as to be vicariously liable for her alleged misconduct. This is not a case in which supervisors are alleged to have ignored or failed to read *misconduct* reports. Rather, Farah's allegation implies that police department supervisors should be held vicariously liable if they do not double-check practically all of the reports written by seasoned officers, and even when those officers are allegedly working on a federal "task force," and he cites no authority to support such a view. Farah also fails to state a claim against the unnamed federal defendants.[3]

The allegations fail to state a claim for supervisory liability as to John Does 1-5 or Richard Roes 1-5, and these defendants are entitled to qualified immunity as to these counts.

---

[3] Moreover, "[i]n general," it "is impermissible to name fictitious parties as defendants," although an action may proceed against "a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Farah's allegations vaguely describe five persons—why five is unclear—from various "federal law enforcement agencies" who were assigned to the same "task force" as Weyker and "whose duties and responsibilities on the 'task force' included the supervision, oversight or review of the work done by Weyker for the 'task force' or who knew or were on notice of her fabrication . . . ." Compl. ¶ 5. These allegations do not meet the *Rosenberg* standard.

### c. Municipal Liability

Farah sues St. Paul for municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. A municipality is, however, liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.*

A plaintiff therefore must show that there is an "official" policy or a "custom or usage with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citation omitted). "Misconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (citation omitted). Also, "the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct.'" *Id.* at 1075-76 (citation omitted). The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). Even if no individual employee is found liable, a municipality might be liable, but only where "the combined actions of multiple officials or employees may give rise to a constitutional violation." *Id.*

Farah does not adequately support his conclusory municipal liability allegations. He does not allege with well-pleaded facts that Weyker or other St. Paul Police Department employees

fabricated evidence in other investigations, nor that policymaking officials in the department were aware of any previous incidents of fabrication of evidence. He does not allege well-pleaded facts to support a theory that multiple St. Paul Police Department members combined to violate his rights. Nor does he allege facts that would demonstrate an official department *policy* that moved officers to fabricate evidence or coerce witnesses and mislead prosecutors and grand juries to secure indictments. He also does not plausibly allege any such *custom* because, among other reasons, he has not adequately alleged notice, as explained above. The City of St. Paul is entitled to qualified immunity on these claims.

## VI. Conclusion

Defendants are entitled to qualified immunity on all counts except Counts I and II, which survive in part. The Court dismisses these counts with prejudice to the extent that they plead violations of the Fourteenth and Fifth Amendments. The Court grants the motion for judgment on the pleadings as to Defendants the City of St. Paul and John Does 1-5, dismissing with prejudice, and also dismisses the count against Richard Roes 1-5 with prejudice. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060-61 (8th Cir. 2013); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010). The Court will not grant leave to amend based on a request made in passing at the end of a brief without complying with local rules or in any way indicating what changes might be made. *See In re Baycol Prod. Litig.*, 732 F.3d 869, 880 n.8 (8th Cir. 2013).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant Heather Weyker's Motion to Dismiss [Dkt. No. 28] is GRANTED IN PART and DENIED IN PART consistent with the above opinion.

2. Defendant City of Saint Paul's Motion for Judgment on the Pleadings [Dkt. No. 34] is GRANTED.

18

3. Counts III, IV, and V of Plaintiff Yasin Ahmed Farah's Complaint are DISMISSED WITH PREJUDICE.

4. Counts I and II of Plaintiff Yasin Ahmed Farah's Complaint are DISMISSED WITH PREJUDICE to the extent that they plead violations of the Fifth and Fourteenth Amendments.

Dated: August 9, 2017

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge